IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

**FILED**
**November 12, 2024**
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 22-839

JONATHAN FRAME,
Superintendent, Mt. Olive Correctional Complex,
Respondent Below, Petitioner,

v.

BARRY D. WHITE,
Petitioner Below, Respondent.

Appeal from the Circuit Court of Mercer County
The Honorable Mark Wills, Judge
Civil Action No. 17-C-198

VACATED AND REMANDED

Submitted: October 22, 2024
Filed: November 12, 2024

Patrick Morrisey, Esq.
Attorney General
Karen C. Villaneueva-Matkovich, Esq.
Deputy Attorney General
Holly M. Mestemacher, Esq.
R. Todd Goudy, Esq.
Mary Beth Niday, Esq.
Assistant Attorneys General
Office of the Attorney General
Charleston, West Virginia

Derrick W. Lefler, Esq.
Princeton, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus Point 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

2.      "Our post-conviction habeas corpus statute, W.Va. Code § 53-4A-1 *et seq.* (1981 Replacement Vol.), clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syllabus Point 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984).

3.      "A judgment denying relief in post-conviction habeas corpus is res judicata on questions of fact or law which have been fully and finally litigated and decided, and as to issues which with reasonable diligence should have been known but were not raised, and this occurs where there has been an omnibus habeas corpus hearing at which the applicant for habeas corpus was represented by counsel or appeared pro se having

i

knowingly and intelligently waived his right to counsel." Syllabus Point 2, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

4.      "A prior omnibus habeas corpus hearing is res judicata as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however, an applicant may still petition the court on the following grounds: ineffective assistance of counsel at the omnibus habeas corpus hearing; newly discovered evidence; or, a change in the law, favorable to the applicant, which may be applied retroactively." Syllabus Point 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

5.      "'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.' Syllabus Point 1, *Halstead v.*

*Horton*, 38 W. Va. 727, 18 S.E. 953 (1894)." Syllabus, *State v. Frazier*, 162 W. Va. 935, 253 S.E.2d 534 (1979).

6. "A new trial on the ground of after[-]discovered evidence or newly discovered evidence is very seldom granted and the circumstances must be unusual or special." Syllabus Point 9, *State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966).

7. "West Virginia Code section 53-4A-7(c) (1994) requires a circuit court denying or granting relief in a habeas corpus proceeding to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner, and to state the grounds upon which the matter was determined." Syllabus Point 1, *State ex rel. Watson v. Hill*, 200 W. Va. 201, 488 S.E.2d 476 (1997).

WALKER, Justice:

In 2001, Respondent Barry White was convicted of multiple sexual offenses involving his four minor stepchildren, including sexual assault, abuse, and exploitation. After a direct appeal and various petitions for writs of habeas corpus were denied, Mr. White filed the underlying habeas petition on the basis of newly discovered evidence. Relying on transcripts of interviews from three of the now-adult victims who did not testify at trial, Mr. White argued that the victims "recanted" or otherwise denied that Mr. White sexually assaulted, abused or exploited them. The Circuit Court of Mercer County granted Mr. White relief in habeas corpus and ordered a new trial. Petitioner Jonathan Frame,[1] Superintendent of Mt. Olive Correctional Complex, appeals that order.

Petitioner contends that the purported "recantations" of the child victims are not new evidence, but cumulative of the trial evidence that showed the children were wavering in accusations against both Mr. White and their biological father. Petitioner also argues that the order does not adequately analyze the factors required before habeas relief may be granted on the basis of new evidence. We agree with Petitioner's latter argument

---

[1] Since the filing of the petition, the acting superintendent at Mount Olive Correctional Complex has change and the Court has made the necessary substitution of parties under Rule 41(c) of the West Virginia Rules of Appellate Procedure.

and vacate and remand the order granting habeas relief with instruction that the circuit court undertake that weighty analysis.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2001, a grand jury indicted Mr. White for 120 counts of sexual offenses involving his four minor stepchildren, D.H., S.H.-1, S.H.-2, and M.H.[2] At the time of the assaults, the children were ages 8, 6, 4, and 2, respectively. Mr. White met the children's mother while still an inmate at Huttonsville Correctional Center[3] and moved into their home upon his parole, in July of 1999. He and the children's mother married in August 1999. Not long after, in November 1999, the children were removed from the home because of an incident where Mr. White hit two-year-old M.H. with his car while drunkenly attempting to leave the home.[4] But prior to that incident, DHS had been involved with the

---

[2] We use initials in cases involving sensitive facts to protect the identities of those involved. *See* W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). The victims now go by different names, but we maintain the initials from the time of trial for the sake of clarity.

[3] Mr. White was incarcerated on voluntary manslaughter charges involving a former girlfriend.

[4] The record is unclear on the timeline and immediate cause for removal. Some portions of the record indicate that the driving incident prompted removal from the home in November 1999. Others indicate that the Child Protective Services worker returned to the residence in November for a safety check because the CPS worker testified that the children were removed in the context of a continued investigation, at which time the mother told the worker to "take the children and get out of her damn house." Nevertheless, the procedural history of the abuse and neglect proceedings is important for our purposes only to the extent that the therapists who testified were involved with the children prior to the allegations against Mr. White and to the extent that one therapist's evaluation of the children was challenged on the basis that the children might not have been truthful with

2

children on an ongoing basis based on, among other things,[5] prior sexual abuse of D.H. by the children's biological father that occurred before Mr. White's relationship with their mother.

In the course of prior abuse and neglect proceedings, the older two children, D.H. and S.H.-1, participated in therapy with Phyllis Hasty at the Southern Highlands Community Mental Health Center, where she worked as a children's counselor and registered play therapist.[6] Later, in abuse and neglect proceedings that were filed after Mr. White and the children's mother married, D.H. and S.H.-1 were evaluated in May through July 2000 by Susan McQuaide, a licensed social worker who, at the time, was Director of Sexual Assault Services for Kanawha Valley. By August 2000, the children were again seen by Ms. Hasty, who was in closer proximity to them. During one of D.H.'s first few sessions with Ms. Hasty, D.H. reportedly discussed sexual abuse by her biological father, then commented that he didn't touch her or do as much as Mr. White had. After that

---

her because the mother was still attending the sessions alongside the foster placements because her rights had not yet been terminated.

[5] The record indicates that there was a safety plan in place and that ongoing issues with drug use, domestic violence, physical abuse, and neglect were being monitored prior to the children's removal in November 1999.

[6] According to trial testimony, Ms. Hasty first met the older two children in 1994 in the course of an abuse and neglect proceeding against the mother for physical abuse and neglect. She later had sporadic involvement in their treatment in 1998 when the children's mother brought them in for behavioral issues, again in 1999, and finally in 2000 when the foster mother sought treatment for them. The sessions in 2000 are the sessions that address allegations against Mr. White.

3

disclosure, Ms. Hasty made a report to Child Protective Services and found out that S.H.-1 had made similar comments to Ms. McQuaide but was equivocal in the accusations.

Law enforcement began an investigation and Mr. White and the children's mother left the state after being interviewed by police. The grand jury issued a 120-count indictment[7] against Mr. White in February 2001 and a bench warrant issued after Mr. White and the mother did not make court appearances.[8] They were located the next month in Kansas and brought back to stand trial.

## A.    *Pretrial Ruling on Disclosures*

In the litany of pretrial rulings made by the trial court in 2001, of import here is the ruling stemming from the children's inability to testify at trial. The record shows that the children were evaluated by a psychologist to test whether they would be able to face Mr. White in court and to tell the truth.

After evaluation, the children did not testify for several reasons, with age being the apparent primary factor for S.H.-2 and M.H. As to D.H., the psychologist found that she was fearful of Mr. White, and there was concern that her low intellectual capacity,

---

[7] Fifteen counts in the indictment were dismissed before trial.

[8] The children's mother was indicted for twenty counts of child neglect resulting in serious bodily injury. The matters were consolidated until trial and she later entered a guilty plea to four counts of child neglect resulting in injury.

4

poor attention span, and suggestibility through leading questions would make it difficult for her to testify. The psychologist similarly found that S.H.-1 was low functioning, but not as inhibited as D.H. S.H.-1, however, also exhibited a patent fear of Mr. White to the point that, once placed with the foster home, he would not leave the house without a whistle out of fear that Mr. White or his mother would take him. Most problematically, S.H.-1 stated to the psychologist he would lie to protect himself if he felt threatened by Mr. White.

The issue was presented to the court in the context of a motion to suppress statements the children made to Ms. Hasty as both hearsay and violative of the Sixth Amendment right to confrontation. The court denied that motion citing the then-recent *State v. Pettrey*[9] that, coincidentally, came out of the same circuit court and involved the testimony of the same therapist.[10] In *Pettrey*, the children did not testify at the trial and this Court found no violation of the Confrontation Clause[11] and that the children's statements were admissible through testimony of their therapist because it fell under the medical diagnosis exception to hearsay:

---

[9] 209 W. Va. 449, 549 S.E.2d 323 (2001).

[10] *Id.* at 453, 549 S.E.2d at 327.

[11] *Id.* at 456-57, 549 S.E.2d at 330-31. In concluding that admission of the statements did not present a confrontation issue, this Court applied *State v. Kennedy*, 205 W. Va. 224, 517 S.E.2d 457 (1999), which modified prior West Virginia law on confrontation to comply with the Supreme Court of the United States decision in *Ohio v. Roberts*, 448 U.S. 56 (1980). The test for reliability found in *Ohio v. Roberts* was later rejected in the context of testimonial hearsay in *Crawford v. Washington*, 541 U.S. 36 (2004), discussed *infra*.

5

When a social worker, counselor, or psychologist is trained in play therapy and thereafter treats a child abuse victim with play therapy, the therapist's testimony is admissible at trial under the medical diagnosis or treatment exception to the hearsay rule, West Virginia Rule of Evidence 803(4), if the declarant's motive in making the statement is consistent with the purposes of promoting treatment and the content of the statement is reasonably relied upon by the therapist for treatment. The testimony is inadmissible if the evidence was gathered strictly for investigative or forensic purposes.[12]

Consistent with this Court's holding in that case, the trial court similarly admitted the children's statements made to Dr. Wallace and Ms. Hasty.

## B.    *Trial*[13]

Mr. White's trial began on December 4, 2001.  In opening statements, both the State and defense acknowledged that D.H. had been sexually assaulted by her biological father and put the matter beyond dispute to the jury.  The State explained that the children would not be testifying, but that D.H. had proven truthful in her accusations against her biological father and that her statements to Ms. Hasty should also be believed.  More specifically, the State acknowledged that the children's statements to Ms. McQuaide had varied but contended that at the time the children had sessions with her, their mother's parental rights were still intact and she attended some of the sessions with Ms. McQuiade.

---

[12] Syl. Pt. 9, *Pettrey*.

[13] While not exhaustive of all evidence or witnesses presented during trial, the following recitation of facts accounts for the evidence and witnesses that we find most germane to this appeal.

For that reason, the State argued, the children did not begin disclosing the abuse until they were placed in foster care and began sessions with Ms. Hasty.

The defense anticipated that the evidence elicited from Ms. McQuaide would show that the children had been equivocal in their accusations against Mr. White. And, because the children had been exposed to sexual assault by the biological father, either directly in the case of D.H., or by seeing it occur, in the case of S.H.-1, that the children had transferred that knowledge onto Mr. White because it wasn't a big jump to make from father to stepfather.

### 1. *Dr. Wallace*

The State opened its case with the testimony of Dr. David Wallace, a practitioner specializing in child sexual abuse. Dr. Wallace testified that he examined D.H. and S.H.-1 in November 2000 and that his typical practice is to first speak to the adult who brings the child for examination and then to speak to the child privately. He explained that a narrative in the case of child sexual abuse is often necessary because sixty-five to seventy percent of children do not show physical signs of abuse and may still be abused despite a normal exam. As to S.H.-1, Dr. Wallace observed no physical signs of sexual abuse. But his notes reflected S.H.-1's statement that he was being seen "'because [Mr. White] was mean to me.'" When asked what Mr. White did, S.H.-1 stated "'[o]ne night I was sleeping on the couch and mommy – and [Mr. White] took off their clothes and they didn't go to sleep'" . . . . "I had to stay up all night because I was afraid." S.H.-1 then disclosed that

7

Mr. White had punched him and in the same breath said that Mr. White touched him on his "middle parts."

As to D.H., Dr. Wallace testified that she exhibited physical signs of sexual abuse in both the hymen and rectum. Dr. Wallace further testified that he was unaware that D.H. had been sexually assaulted by her biological father, but that the scarring did not appear to be several years' old, but rather six months old, more or less. When relaying the disclosures D.H. made during his examination, Dr. Wallace read from his notes that she was being examined because "'[Mr. White] treated me wrong,'" and when prompted to explain, stated that he had touched her, pointing to her vaginal area. She further stated that he touched her with his "wiener," "front and back" at home while the mother was at work.

## 2. *Phyllis Hasty*

In her testimony, Ms. Hasty initially explained to the jury why the children themselves were not present to testify, discussed above. Ms. Hasty explained that she had been involved with the children in play therapy before Mr. White moved into their home and that it was during the course of therapy related to sexual assault by the biological father that D.H. also disclosed sexual assault by Mr. White.

After the initial disclosure, Ms. Hasty testified that the allegations were developed in several subsequent sessions. Specifically, Ms. Hasty detailed that as part of D.H.'s therapy, she suggested that she make a list or draw to "express every single thing

8

that they are mad at" and, as a way to give the child some sort of control or victory over those traumas, had her patients either rip it up, stomp on it, or otherwise destroy it. D.H.'s list included, in graphic detail that Mr. White had penetrated her vaginally and anally, performed oral sex on her, and made her perform oral sex on him, described semen, described that he showed her "nasty movies," and that she saw him "do nasty stuff to my brothers and sisters, too." She further disclosed that he said he would kill her or kill her mother if she told anyone. On cross-examination, the defense asked Ms. Hasty to read D.H.'s list of "bad things" that the biological father had done to make her angry, and while there were some notably distinct references, Ms. Hasty agreed that there were similarities in the two lists.

Ms. Hasty's sessions with S.H.-1 were initially aimed at helping with attention deficit disorder and aggression, and he did not initially disclose any sexual conduct in relation to either the biological father or Mr. White, but he did tell Ms. Hasty that he had seen the biological father sexually assaulting D.H. while they lived in Florida. When S.H.-1 returned for a visit with the foster mother, the foster mother informed Ms. Hasty that S.H.-1 had disclosed sexual abuse to a neighbor and then to her. Ms. Hasty did a similar exercise with S.H.-1 where he listed things he was angry about. His list corroborated D.H.'s list—that Mr. White would vaginally and anally penetrate D.H. and perform and receive oral sex. S.H.-1 added that Mr. White touched his private parts and would perform oral sex on him and made him perform oral sex on Mr. White. S.H.-1

9

further disclosed that Mr. White made the children touch and perform oral sex on one another, and that he threatened to kill them if they told anyone.

Ms. Hasty testified that S.H.-2 disclosed touching but did not seem to comprehend the wrongness of it. M.H., the youngest, reportedly "thought it was silly" when told to engage in sexual acts with his siblings and just did what he was told. She further testified that her work with S.H.-2 primarily involved proper body boundaries because both S.H.-2 and M.H. were too young to comprehend that they were victimized, and that she worked with S.H.-2 on curbing sexualized behaviors acted out on herself and with her siblings.

In relation to testimony discerning the biological father's acts from the allegations against Mr. White, the State confirmed with Ms. Hasty that there was no indication that the biological father had committed any sexual acts against S.H.-1, S.H.-2, or M.H., and that the younger two children hardly knew him and had very little access to him because he was incarcerated.

Ms. Hasty was then cross-examined in relation to Ms. McQuaide's report from her forensic interviews conducted in May through July of 2000. In that report, discussed in more detail below, Ms. McQuaide noted that S.H.-1 had disclosed abuse by Mr. White, but recanted by the end of the session, often contradicted himself, and avoided her questions. To this, Ms. Hasty testified that the nature of Ms. McQuaide's evaluation

10

was different than her approach, which could account for why S.H.-1 was able to appropriately sequence events, was more forthcoming, and did not waver. And, Ms. Hasty had previously noted that she was not surprised at Ms. McQuaide's conclusion or in S.H.-1's equivocation considering that, at the time he was interviewed, his mother's parental rights were still intact[14] and she had attended the interviews.

### 3. *Jail Letters*

The State also presented the testimony of three female inmates who were incarcerated in Southern Regional Jail with both Mr. White and the children's mother, and, specifically, were in a pod with the mother.[15] According to trial testimony, Mr. White and the children's mother would send letters to one another by routing them through the mail to his mother, who would repackage and mail the letter back to the jail.

According to the testimony, the children's mother asked the other inmates to, at various times, hold the letters from Mr. White for her, write, or address her letters to him so that she would not be caught. They testified that they read the letters or were permitted to read them with the mother's knowledge. Because the couple used an intermediary to pass the letters and because all letters to the jail are opened first, the marital privilege did

---

[14] The mother's rights were terminated the following month, in July 2000.

[15] The inmates testified that they sought out the prosecutor themselves after reading the letters, and those that were asked testified that they were not given anything by the State in exchange for the information or for their testimony.

11

not apply and the inmates were permitted to testify on the admissions made in the letters.[16] According to the inmates, Mr. White admitted in explicit, disturbing detail that he had sexual assaulted D.H. and S.H.-1. They further testified that the mother, upon reading the letters was upset and said that he didn't know what he was talking about and that he didn't do it. After their testimony, the State rested.

### 4. Susan McQuaide

Defense witness Susan McQuaide testified to her five sessions with D.H. and S.H.-1 in May through July of 2000, and classified those sessions as therapy, not as forensic interviews. She was also counseling the mother at the same time. Ms. McQuaide testified that D.H. disclosed abuse by her biological father in those sessions but did not disclose any inappropriate touching by Mr. White. Ms. McQuaide testified that in subsequent sessions she sought clarification from D.H. on "which daddy gave her bad touches." D.H. responded with the biological father's name, and, when asked about Mr. White, she said, "no, he's nice."

According to Ms. McQuiade, the mother indicated that D.H. had sexualized behaviors from a young age and would, in the mother's words, flirt with Mr. White. The

---

[16] That the letters themselves were not available was the subject of much controversy prior to trial and in subsequent proceedings. The circuit court ultimately determined that the State had no duty to preserve the letters because they did not have control over them, and it was typical practice for jail authorities to dispose of contraband. That determination was never overturned by any subsequent reviewing court.

mother also disclosed that S.H.-1 stated to her that he had seen the biological father's abuse of D.H., that S.H.-1 exhibited sexualized behaviors, and that he would cling to adult males. S.H.-1 did not disclose to Ms. McQuaide that the biological father had touched him inappropriately, but he did disclose that Mr. White had. Ms. McQuaide testified that she found S.H.-1 to be unreliable because he would evade her questions and after disclosing touching by Mr. White, responded later in the session that Mr. White had not touched him.

Ms. McQuaide concluded that, as to D.H., her biological father had abused her, and, as to S.H.-1, testified "I suspect that he's been sexually abused and he's probably been sexually abused by both." She went on to hedge that "there's nothing he told me that was concrete because when you have recanting, you know, most often when kids have sexually acting out behaviors and then they recant they have been sexually abused[.]"

Ms. McQuaide testified that she was aware that the children saw Ms. Hasty after concluding their sessions with her and that the children disclosed sexual abuse by Mr. White to Ms. Hasty. Ms. McQuaide was not critical of Ms. Hasty's approach to the children's therapy and indicated that her approach was more child-led. She testified that it is common for sexually abused children to disclose the least serious touching first to gauge how the therapist will react before disclosing more serious acts in subsequent sessions because they see it as shameful. She further testified in relation to the disclosures made to her versus those made to Ms. Hasty that it is possible that they did not feel safe enough to disclose Mr. White's acts against them at the time she saw them because the mother was

13

still in their lives and that a child does not typically tell a consistent story until he or she feels safe.

### 5. *Dr. Wyatt*[17]

Dr. Joseph Wyatt, a professor of psychology at Marshall University specializing in clinical psychology, testified for the defense. In his view, the children's statements made to Ms. McQuaide denying abuse by Mr. White were more credible than those made to Ms. Hasty. The basis for that opinion was that the children had never had what he would deem to be a forensic interview, but that Ms. McQuaide's assessment was the closest thing. Ms. Hasty assessed them in therapy, that, in his professional opinion serves a different purpose than fact-finding and often evolves into the therapist becoming an advocate.

As to the statements given to Dr. Wallace, Dr. Wyatt commended him for not asking leading questions but noted that Dr. Wallace had not known at the time of his evaluation that the biological father had sexually assaulted D.H. and so had not attempted to discern what allegations were levied against Mr. White as opposed to the biological father. But Dr. Wyatt recognized that Dr. Wallace is a physician and would not expect him

---

[17] Dr. Wyatt testified for the defense before the State rested as a matter of agreement, but we recite his testimony here as though chronological.

to interview the children to discern truth or falsity except to the extent it required him to collect information pertinent to evaluation and treatment.

Dr. Wyatt also testified that the reliability of the children's statements was questionable because the children were interviewed so many times by various individuals who asked similar questions in different ways. Explaining the different answers, he testified that, at some point, children often develop a need to give a "preferred" answer and "it kind of got to the point where it's hard to know what happened." In support, he cited a study to the effect that children who are interviewed multiple times often change their story. He further testified to D.H. and S.H.-1's diminished intellectual capacities and susceptibility to suggestion.

### 6. *Dr. Estep*

The defense next called Dr. David Estep, Jr., a psychiatrist who specializes in forensic psychiatry. He testified that he reviewed records, interviewed Mr. White, and administered psychological tests. In analyzing that data, Dr. Estep testified that Mr. White did not fully disclose psychological symptoms or behaviors, suggesting that he was proactively managing his impressions to present himself in a favorable light. Despite that, Dr. Estep found that Mr. White's measured responses did not rise to the level of invalidating the tests, and, diagnostically, Mr. White did not meet the criteria for any sexual behavior disorder toward children.

*C.* *Conviction and Postconviction Proceedings*

After deliberating for just over an hour and a half, the jury convicted Mr. White on all 105 counts. He was sentenced to serve a minimum of one hundred years and a maximum of two hundred twenty years imprisonment. Mr. White filed a direct appeal of his conviction, arguing, among other things that the circuit court erred in permitting the inmates to testify to the contents of the letters and in permitting Ms. Hasty to testify to the children's disclosures in violation of his constitutional right to confrontation. This Court refused his appeal by order in 2003.

Mr. White then filed his first petition for a writ of habeas corpus in 2005 in the Circuit Court of Mercer County. In that proceeding, he again raised, among other things, a violation of his right to confrontation based on Dr. Wallace and Ms. Hasty's testimony as to the children's statements and a due process challenge to the inmates' testimony relative to the letters he sent to the children's mother. The circuit court denied him relief without a hearing, and this Court denied his appeal by order in 2006. Mr. White filed another petition in 2007 and an amended petition in 2009, both in the United States District Court for the Southern District of West Virginia, in which he raised similar grounds for relief. That matter was stayed pending the outcome of another petition Mr. White filed in 2009 in the Circuit Court of Mercer County, again alleging, among other things, that he was denied his right to confrontation and taking issue with the evidentiary rulings surrounding the inmates' testimony and purported destruction of the letters.

16

The circuit court held an omnibus hearing and denied him relief in 2012. This Court affirmed the denial of habeas relief in *Barry W. v. Ballard*.[18] Mr. White then proceeded on his federal habeas claim. The United States Magistrate Judge entered proposed findings and recommendations that Mr. White's habeas petition be dismissed and the United States District Court for the Southern District of West Virginia adopted those proposed findings and dismissed his federal habeas petition by memorandum decision in *White v. Ballard*.[19] Mr. White then filed another state habeas petition that the circuit court denied on res judicata grounds without a hearing, and, in 2017, this Court affirmed that denial in *Barry W. v. Ballard* (*Barry II*).[20]

The initial petition for a writ of habeas corpus underlying this appeal was filed just two months after *Barry II* was issued. Counsel was appointed for Mr. White and an amended petition was filed in 2019. Mr. White there argued that there was newly discovered evidence that warranted a new trial. Specifically, the amended petition alleged

---

[18] 2013 WL 3184855, No. 12-0795 (memorandum decision) (W. Va. June 24, 2013).

[19] 2014 WL 4851979, No. 1:07-0567 (memorandum decision) (S.D.W. Va. Sept. 29, 2014).

[20] 2017 WL 656995, No. 16-0214 (memorandum decision) (W. Va. February 17, 2017).

that three of the child victims had "recanted." The amended petition included attached transcripts of an investigator's interviews with S.H.-1, S.H.-2 and M.H.[21]

S.H.-1 was, at the time of the interview, just shy of twenty-five years old and incarcerated at Pruntytown Correctional Center and Jail. The interview suggests that he heard that Mr. White "might be giving him another case and a chance to get the truth to come out" so he wrote a letter to Mr. White's counsel saying that the biological father, and not Mr. White, had sexually assaulted D.H. He further stated that he was not allowed to testify at trial, and that "judges and cops . . . [y]ou know that whole case was very dirty."

When asked about D.H., S.H.-1 said that she lived in Nebraska, was mentally handicapped, and had had her children taken from her. And, when asked what he thought D.H. would say about Mr. White, he said "[s]he might be willing to help but I'm not sure." He had similar expectations of S.H.-2 and M.H.

S.H.-2, at the time of the interview was twenty-three years old. When asked about her relationship with Mr. White, S.H.-2 responded, "[u]h, that's my father, I think." She said that she thought he was a good guy, but then stated that "I haven't got to meet him, but I would like to meet him to see how far he's come." She responded, "no" when

_____

[21] If D.H. was interviewed, the transcript of that interview was not included in the exhibits to the amended petition. It is unclear from the "transcripts" how they were produced, but there is mention of a recorder. The interviews were not sworn statements but there is no indication from the record that their validity was in question.

asked whether Mr. White was sexually inappropriate to her or to her siblings, but when asked to summarize any experiences with Mr. White prior to the trial and investigation, she said "I don't remember any of that." When the interviewer asked S.H.-2 about D.H., S.H.-2 responded that D.H. was "not all there" but that D.H. did not like Mr. White and when they spoke "about what was going on," presumably in relation to the interviews, D.H. said "he needs to stay where he's at."

M.H. met with the interviewer as well, at which time he was twenty-one years old. In his interview, M.H. stated that "his older sister says that [Mr. White] did a bunch of different things, but I don't know if she's just been told that or she remembers it." When he spoke to D.H. to let her know that she might be asked to do an interview, M.H. said "she just went ahead into all of the stuff [Mr. White] did wrong" and that she had mentioned walking in on Mr. White with S.H.-1 and S.H.-2. For his part, M.H. stated that he was not aware of sexually inappropriate behavior toward him or his siblings and added at the end of his interview "I don't really know anything. I know what I've been told so."

The circuit court held an omnibus evidentiary hearing in December 2020, where all four child victims testified. M.H. testified first. In his testimony, he stated that he had never met Mr. White, or really talked to him and had only heard what people had told him. As to the sexual abuse, M.H. testified that Mr. White was never sexually inappropriate that he knew of and that he was too young to remember anything that could have happened because he was one or two years' old at the time.

19

S.H.-1 testified next, by phone from Salem Correctional Center and Jail. S.H.-1 testified that he had known Mr. White for twenty-three years, that he was never sexually inappropriate with him, and that he was not permitted to testify at the trial. Later in his testimony, however, he said he did not recall speaking to anyone about testifying in court, just that the children were told they could not attend the hearings.

S.H.-1 testified that he remembered Mr. White "very well," and that Mr. White was around his siblings but didn't pay them any attention. S.H.-1 said that he was around Mr. White quite a bit, and "[he] was always trying to be like [Mr. White]. So, [he] would run around with [Mr. White] and stuff." He confirmed that he had seen his biological father molesting D.H. and said "I think that's where everything got confused at."

S.H.-1 testified that he recalled sexualized behavior between himself and S.H.-2. He recalled speaking to Ms. Hasty, but did not recall any specifics regarding those sessions, and was not asked about the statements he gave to her regarding his own abuse. He did not recall Ms. McQuaide at all, nor did he recall saying to the psychologist evaluating his ability to testify that he would lie on the stand if he felt threatened by Mr. White.

S.H.-2 testified in person. Her testimony was brief and can be summarized by the following exchange:

> Q.  Okay. So, you were way too young to even remember anything?

20

A. Yes.

Q. So, do you even remember Mr. White?

A. No, I do not.

Q. So, you wouldn't be able to provide us really any information regarding Mr. White's sexual inappropriate contact?

A. No, sir.

D.H., by this time twenty-nine years old, testified by phone. D.H. testified that she met Mr. White when she was two years old and that he was around until around the time she turned seven. She repeatedly testified generally that he had never been sexually inappropriate with her, and that she had "not a clue" where those accusations would have come from. She further testified that her biological father did sexually abuse her and that her biological father would touch her brothers and sister inappropriately and made them "have sex with one another." She recalled speaking with a therapist but did not recall any names. Though she remembered that the sexual abuse did not happen, she did not remember what she told anyone at the time of the allegations. Toward the end of the questioning, when D.H. responded "Do what?" to a question, the follow up question was whether she was on any type of medication, and D.H. responded "No, I have my kids around me right now."

Mr. White's counsel then argued that because the child victims did not testify but their statements were admitted through third parties, their "recantations" qualified as

newly discovered evidence since they were now, as adults, saying that the abuse didn't occur. The State responded that only two of the witnesses denied abuse, and of those two, S.H.-1 admitted that he was enamored with Mr. White, was clearly maintaining those familial relationships, and had previously said he would lie on the stand. As to D.H., Petitioner Frame argued that her testimony was unreliable at best given the plainly erroneous timeline she offered.

By order dated October 12, 2022, the circuit court granted Mr. White's petition for habeas relief on the basis of new evidence, finding that three of the child victims had recanted. Petitioner Frame appeals from that order.

## II. STANDARD OF REVIEW

This Court's review of an order granting relief in habeas corpus is reviewed under the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.[22]

---

[22] Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

## III.   ANALYSIS

We have recognized that a proceeding in habeas corpus is a single-use mechanism for relief and operates to definitively preclude future relief on any bases actually raised or that could have been raised:

> Our post-conviction habeas corpus statute, W.Va. Code § 53-4A-1 *et seq.* (1981 Replacement Vol.), clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover.[23]

Consistent with that exhaustion precedent, because Mr. White has had the benefit of an omnibus hearing and was denied relief, the prior proceedings act as res judicata to subsequent habeas petitions absent an exception to the doctrine:

> A judgment denying relief in post-conviction habeas corpus is res judicata on questions of fact or law which have been fully and finally litigated and decided, and as to issues which with reasonable diligence should have been known but were not raised, and this occurs where there has been an omnibus habeas corpus hearing at which the applicant for habeas corpus was represented by counsel or appeared pro se having knowingly and intelligently waived his right to counsel.[24]

Those exceptions to res judicata in the context of successive habeas petitions are (1) ineffective assistance of habeas counsel; (2) newly discovered evidence; or (3) a change in the law:

---

[23] Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984).

[24] Syl. Pt. 2, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

A prior omnibus habeas corpus hearing is res judicata as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however, an applicant may still petition the court on the following grounds: ineffective assistance of counsel at the omnibus habeas corpus hearing; newly discovered evidence; or, a change in the law, favorable to the applicant, which may be applied retroactively.[25]

## A.      *Petition for Habeas Corpus on the Basis of Newly-Discovered Evidence*

Mr. White's petition was filed utilizing the newly-discovered evidence exception. In evaluating whether a new trial may be had on the basis of newly discovered evidence, we determine if the evidence is in fact new, newly discovered, and sufficiently important that it is likely to have altered the outcome. To that end, we held in *State v. Frazier* that,

> "[a] new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the

---

[25] *Id.* at Syl. Pt. 4.

sole object of the new evidence is to discredit or impeach a witness on the opposite side." [26]

We have reiterated that all five criteria must be satisfied before a new trial may be granted on the basis of newly-discovered evidence.[27] Our standard of review affords the circuit court deference in its analysis of these factors, but we have cautioned that "[a] new trial on the ground of after[-]discovered evidence or newly discovered evidence is very seldom granted and the circumstances must be unusual or special."[28]

Mr. White alleges that the new evidence warranting a retrial is that three of the child victims, who did not testify at trial, recanted allegations that Mr. White had committed sexual acts against them. The circuit court similarly found that three of the child victims had recanted. We begin our analysis by framing the new evidence to correct a factual error in the circuit court's order. The petition before the circuit court originally alleged that three of the victims had recanted and attached unsworn interview transcripts of conversations with S.H.-1, S.H.-2, and M.H., purporting to make up the three "recantations."

---

[26] Syllabus, *State v. Frazier*, 162 W. Va. 935, 253 S.E.2d 534 (1979) (quoting Syl. Pt. 1, *Halstead v. Horton*, 38 W. Va. 727, 18 S.E.953 (1894)).

[27] *Id.* at 941, 253 S.E.2d at 537; *see also State v. Crouch*, 191 W. Va. 272, 276, 445 S.E.2d 213, 217 (1994) ("If any of the foregoing five essential requirements is not satisfied or complied with, a new trial will not be granted on the ground of newly discovered evidence.").

[28] Syl. Pt. 9, *State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966).

From our review of the testimony at the omnibus hearing, it is beyond dispute that S.H.-2 and M.H. did not recant. S.H.-2 testified that she was too young at the time to remember anything, and that she would not be able to provide any information as to whether Mr. White committed any sexual acts against them. M.H. testified that there was no abuse "that he knew of" but that he too young to remember anything because he was only one or two at the time. He further stated, "I know what I've been told." We do not find that either S.H.-2 or M.H.'s testimony amounts to anything resembling a "recantation"[29] and that the circuit court erred in finding that three of the victims had recanted, when, at best, two may have. With that, our analysis proceeds with the starting point that the alleged new evidence is limited to D.H.'s testimony at the omnibus hearing and S.H.-1's interview and testimony at the omnibus hearing.

## B.    *Frazier Factors*

Here we have grown children who did not testify at trial, whose statements were lawfully admitted through third parties. Now that they are adults they purportedly wish to "impeach" the statements they made as children. Problematically, the circuit court's analysis of this complex issue begins and ends with the conclusion that the children were not "permitted" to testify at trial and that, as the hearsay declarants, the jury had not heard the story from the source. Mr. White defends the circuit court's conclusion, arguing

---

[29] "Recant" is defined as "[t]o withdraw or renounce (prior statements or testimony) formally or publicly." *Recant*, BLACK'S LAW DICTIONARY (12th ed. 2024).

26

that it is a fundamentally flawed analysis to say that "hearsay statements, admitted at trial through exception, equate to actual first-hand testimony of the declarant."

From the circuit court's findings that the new testimony "would be more believable than testimony that never took place" and repeated references that the children did not testify at trial, it is apparent that the circuit court viewed this as "new evidence" warranting a new trial for the simple reason that the denials were coming from the children (now adults) themselves who did not testify at trial. That reasoning underlies the entirety of the circuit court's analysis of the *Frazier* factors, and indeed, *is* the entirety of the analysis. We disagree that the inquiry is so simple.

Due to the nature of the "new" evidence presented here, there is necessarily some overlap in analysis of the *Frazier* factors. But in conducting our deferential appellate review of these factors, we find little to no analysis to which we must defer, and too many questions over which to ruminate without further development. True, the *Frazier* factors are cited in the circuit court's order, but it appears from our review that there are legal complexities and credibility issues woven throughout that require development and analysis sufficient to permit meaningful appellate review.

### 1. *Admission of Hearsay Evidence and Right to Confrontation*

Fundamentally, the oversimplification of the circuit court's analysis of Mr. White's petition ignores that the lack of cross-examination and inability to confront at trial

27

has been litigated and relitigated twice more before different tribunals. In his direct appeal, his state petition for habeas relief, and his federal petition for habeas relief, Mr. White sought a ruling that the children's statements—unequivocal and otherwise—were both inadmissible hearsay and an affront to his right to confrontation.

The Supreme Court of the United States, in *Crawford v. Washington*,[30] required that before testimonial hearsay may be admitted, the witness must be unavailable and there must have been some prior opportunity for cross examination.[31] Otherwise, there is a Sixth Amendment violation against the right to confrontation.[32] In so doing, the Supreme Court examined and rejected its own "reliability" test from *Ohio v. Roberts*,[33] finding it unworkable in the context of testimonial hearsay.[34] Still, *Crawford* emphasized that the states' framework for the admission of hearsay through its exceptions was still applicable in the context of *non*testimonial hearsay, having already accounted for reliability in its design.[35]

---

[30] 541 U.S. 36 (2004).

[31] *Id.* at 68-69.

[32] *Id. See also* U.S. Const. Amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]").

[33] 448 U.S. 56 (1980).

[34] *Crawford*, 541 U.S. at 67-68.

[35] *Id.* at 68.

We note initially that Mr. White's trial was conducted before *Crawford* was decided and that *Crawford*'s pronouncement does not apply retroactively.[36] Even so, when analyzing Mr. White's dual claim that he was denied the right to confrontation and his claim that the statements made to Dr. Wallace and Ms. Hasty were inadmissible hearsay, both the state and federal habeas courts conducted an analysis addressing *Crawford*.

The trial court's ruling in this regard was based on this Court's decision in *State v. Pettrey*, which applied West Virginia law drawn from the then-authoritative *Ohio v. Roberts* in reaching its conclusion that statements made in the course of treatment were admissible and not violative of the right to confrontation.[37] But in revisiting the application of *Pettrey* to the facts of this case, the reviewing courts found that the statements were properly admitted through a hearsay exception. Because they were not testimonial in nature, they were unaffected by *Crawford*, and the admission of that testimony did not violate Mr. White's right to confrontation.[38]

Also accounting for this Court's refusal of his direct appeal, three courts have already found that Mr. White had no valid complaint against the admission of the children's

---

[36] *See Whorton v. Bockting*, 549 U.S. 406, 420-21 (2006).

[37] *See supra* n.11.

[38] *See Blount v. Hardy*, 337 F. Appx. 271, 276 (4th Cir. 2007) (statement made by child to therapist was not testimonial and did not violate right to confrontation); *U.S. v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005) (admissions of child's statements to physician regarding abuse does not violate right to confrontation).

29

statements nor was he denied a right to confrontation. Yet, the way in which the circuit court here summarily analyzed the *Frazier* factors is indicative that its conclusions were erroneously based on the premise that those rights required some vindication. That is not to say that the fact that the new evidence is from the mouths of the victims is irrelevant, but it must be viewed within the overall context that their prior statements to Dr. Wallace, Ms. Hasty, and Ms. McQuaide were admissible then, would be admissible in any retrial, and Mr. White was not deprived of any right to confront them.

### 2. *New Evidence Versus More Evidence of Inconsistency*

In view of the children's prior statements to Dr. Wallace, Ms. Hasty and Ms. McQuaide, the first issue becomes whether this is "new" evidence or the latest in a series of inconsistent statements and "recantations." As discussed above in our recitation of the facts, D.H. initially denied abuse by Mr. White to Ms. McQuaide but later disclosed it to Dr. Wallace and Ms. Hasty. S.H.-1 denied abuse, disclosed it, then denied it again to Ms. McQuaide, to the point she found him unreliable. But later, he disclosed abuse to both Dr. Wallace and to Ms. Hasty.

The variation in statements was at the forefront of *both* the State's and Mr. White's case at trial. Despite the primacy of their equivocation at the time of trial and that the "new" evidence is described as a "recantation" of those statements, the circuit court's order granting Mr. White relief does not address the children's inconsistent stories whatsoever in the context of its analysis of the *Frazier* factors either in relation to whether

30

the evidence was new and material, known to Mr. White at the time of trial, or simply the latest in a series of allegations and recantations that the jury already heard.

### 3. *Credibility of "Recantation" and Impact*

The circuit court's lack of discussion about the children's inconsistent statements is more concerning in analyzing the fourth *Frazier* factor; whether the testimony would produce an opposite result on a second trial, and, at least in this case, the similar analysis required of the fifth factor—that the evidence is more than just impeachment of a state's witness. The circuit court's conclusion here again rests on the notion that the children were not permitted to testify at Mr. White's trial and that their first-person testimony denying abuse is likely to produce a different result at a second trial. While the conclusion itself may be justified, there are no findings on which to defer to sustain it on appellate review. This is particularly true because there are crucial issues that have not been explored that would tend to cut against satisfaction of these factors in the absence of explanation to the contrary.

Credibility of the new evidence, how the jury would view the "recantations" against their prior inconsistent statements, and the strength of the other evidence against Mr. White required analysis under both the fourth and fifth factors of *Frazier*. In performing its fact-finding function, it is certainly a necessary consideration for the habeas

court to assess and assure that a recantation is reliable and credible in the first place.[39] And, in the second, to evaluate whether the reliability of a recantation is sufficiently convincing to produce a different result at the second trial when viewed against prior inconsistent statements and all other evidence offered at trial. We consider these in turn.

### (a) Threshold Credibility and Capacity of D.H. and S.H.-1

As a threshold matter, we find that some basic inquiry into the capacity of D.H. and S.H.-1 was necessary but absent from the circuit court's order. The evidence elicited at trial showed that D.H.'s IQ was in the 5th percentile and S.H.-1's marginally higher. Mr. White's trial expert testified that those with low intellectual functioning are much more susceptible to suggestion and that "occasionally" children who have been abused and neglected can improve their intellectual capacity "a bit" if they are moved to a different environment at a young age. It is apparent from the interviews with her siblings, and, to some extent, her testimony during the omnibus hearing, that D.H. still suffered from diminished mental capacity.

And, the circuit court conducted no analysis as to whether suggestibility was a factor in how this "new evidence" came about. Neither the State nor the circuit court questioned how S.H.-1 became aware that Mr. White had filed a new habeas petition, or how he obtained the name and address of Mr. White's counsel. The circuit court did not

---

[39] *See, e.g.*, *State v. Nicholson*, 170 W. Va. 701, 296 S.E.2d 342 (1982); *State ex rel. Smith v. McBride*, 224 W. Va. 196, 681 S.E.2d 81 (2009).

32

address the State's argument that S.H.-1 was maintaining contact with at least his mother and, by implication, Mr. White, that he was enamored with Mr. White, or that S.H.-1 had previously said he would lie under oath to protect himself. S.H.-1 testified that he recalled sexualized behaviors between himself and S.H.-2, and Ms. McQuaide, who testified for the defense, stated "most often when kids have sexually acting out behaviors and then they recant they have been sexually abused[.]"

For D.H.'s part, it is evident from the interviews with her siblings that there were credibility issues at play on more than one front. Setting aside the potential capacity issues, no interview with D.H. was attached to Mr. White's amended petition. The interviews that were included make clear that D.H. thought Mr. White should stay in prison and that she maintained he had sexually abused them. D.H. then testified at the omnibus hearing that she had "not a clue" where the allegations had even come from and stated generally that he had never been sexually inappropriate, but her biological father had molested her.

D.H.'s timeline of abuse as to her biological father and Mr. White leaves us with unresolved credibility concerns as well. During the omnibus hearing, D.H. testified that the first time she met Mr. White was when she was two and lived with him until she was seven. But, as the parties stipulated at trial, she was eight when she met him and he was around for only five months. In fact, the limited timeline of exposure from his release in July 1999 to November 1999 when the children were removed from the home was a key

33

defense. She further testified that her biological father would touch her brothers and sisters inappropriately and made them "have sex with one another." But the trial evidence shows that S.H.-2 and M.H. had very little contact with the biological father because he was incarcerated, and that they were both very young at the time they were exposed to him.

Despite these outward credibility issues, the circuit court undertook no analysis of whether the intellectual capacity and suggestibility that prevented these child victims from testifying in the first place had been remedied by the time they were interviewed "recanting" prior statements they didn't even remember making or when testifying at the omnibus hearing. Some analysis needed to be done in the face of signs that the circumstances surrounding the "recantations" should be viewed with at least some suspicion.

### (b) Inherent Unreliability of Recantation Evidence

We have had little opportunity to discuss "recantation" evidence, but in the context of the *Frazier* factors it has been viewed as impeachment evidence of a witness's own prior statement.[40] Where a recanting witness was a key witness for the state, we found in *State v. Stewart* that that type of impeachment evidence may be sufficient to meet the criteria of the fifth *Frazier* factor, provided that the other four are also satisfied.[41] There,

---

[40] *See Nicholson*, 170 W. Va. at 704, 296 S.E.2d at 345.

[41] 161 W. Va. 127, 136, 239 S.E.2d 777, 783 (1977).

we reasoned that the fifth factor creates a general rule, not a mandatory criteria to be satisfied and implies that there are circumstances that are excepted from it.[42]

Taking that thread from *Stewart*, this Court treated a recantation as a type of impeachment evidence in *State v. Nicholson*, where a key state witness recanted his prior trial testimony at the hearing on a new trial.[43] We began the analysis with the recognition that "[a]lthough our Court has not discussed recantation testimony or affidavits as a form of newly discovered evidence, most courts hold that such testimony is exceedingly unreliable and untrustworthy, especially when it involves an admission of perjury."[44] In evaluating the fourth and fifth *Frazier* factors together, we found that unreliability to be dispositive:

> [i]t is obvious that the witness [] either lied at the first trial or lied in his affidavit in support of a new trial. After reviewing the record in its entirety, we do not believe that there is even a remote possibility that the jury would find the recanting affidavits and subsequent testimony any more believable than the original trial testimony. . . . Only under circumstances where there are credible corroborating circumstances that would lead the trial court to conclude that the witness did,

---

[42] *Id.*

[43] 170 W. Va. at 702-03, 296 S.E.2d at 343-44.

[44] *Id.* at 703, 296 S.E.2d at 343.

35

indeed, lie at the first trial, can it be concluded that the fourth criterion [of *Frazier*] has been met.[45]

Mr. White's case presents a unique set of facts, because it is not a "recantation" in the typical sense; the victims did not testify at trial or otherwise under oath. Rather, their statements were lawfully admitted through an exception. In this sense, the now-adult victims purportedly seek to impeach their own statements made as children to Dr. Wallace, Ms. Hasty, and, to some extent, Ms. McQuaide. More unique still, the victims do not directly contend that they "lied" in those statements; they do not recall having made them.

We have explained that "[s]aying that one does not remember a conversation that allegedly took place months earlier is not the same as contradicting the substance of that alleged conversation."[46] Moreover, "'[t]he inconsistency of the impeaching statement must appear clearly upon a direct comparison with the evidence of the witness, and cannot be based on a mere inference.'"[47] Here, while the victims did not recall the statements

---

[45] *Id.* at 704, 296 S.E.2d at 345. The Court in *Nicholson* quotes from the syllabus in *Stewart* rather than *Frazier* in discussing the criterion to be met before a new trial may be awarded. *Stewart* and *Frazier* articulate the same standard for factors 1 to 4 but *Stewart* moves the "general rule" on impeachment from factor 5 to the beginning of the syllabus point. *Compare* Syl. Pt. 2, *Stewart* with Syl., *Frazier*. Because they are rearrangements of the same criteria and this Court consistently uses *Frazier*, we replace *Stewart* with *Frazier* here to avoid confusion.

[46] *Stewart*, 161 W. Va. at 134, 239 S.E.2d at 782.

[47] *Id.* (quoting Syl. Pt. 1, *State v. Brown*, 104 W. Va. 93, 138 S.E. 664 (1927)).

made to Dr. Wallace, Ms. Hasty, or Ms. McQuaide, they *did* testify that they recall now that Mr. White did not abuse them. To add another wrinkle, they had also previously stated that Mr. White had *not* abused them so whether a direct comparison reveals "impeachment" is debatable. Likewise, *Nicholson* views all recantations with an indicia of unreliability but those recantations involving perjury are deserving of more suspicion. Here, where the children did not commit perjury, it is unclear how much, if any, suspicion the circuit court attached to these "recantations." So, the circumstances of this case are not on all fours with our precedent in relation to "impeachment of a key state witness" nor our precedent in relation to viewing "recantations" as unreliable for the mere fact that they involve perjury.

As we recognized in *Nicholson*, a court's meaningfully conducted analysis of recantation evidence is due deference because credibility and reliability take starring roles.[48] But here, we have no such analysis, and we cannot find that this complex inquiry into this unique set of circumstances is satisfied by the circuit court's bare conclusion that "while these recantations will discredit certain State witnesses, this is not their sole purpose" and that the "testimony would be more believable than testimony that never took place."

### (c) Likelihood of Producing a Different Result

---

[48] *Nicholson*, 170 W. Va. at 703, 296 S.E.2d at 344.

37

We are also too cautious to extend blind deference to the circuit court's summary conclusion that the statements ought to produce a different result at trial when there is no analysis of the other evidence offered to support the conviction. The children's prior, close-in-time statements made to Dr. Wallace, Ms. Hasty, and Ms. McQuaide would be presented to the jury *alongside* their now-adult recollections that Mr. White did not abuse them. Whether the jury would find one to be more reliable than the other to such an extent that it ought to produce a different result at the second trial should have been at least considered by the circuit court. But here, it does not address the chronological proximity of the prior statements, that they did not *deny* making them, or that they had previously been inconsistent in making and recanting accusations.

Instead, the order merely states that the recantations would be more believable than testimony that never happened, again focusing not on the substance of their recantations but on D.H. and S.H.-1 as first-party storytellers. In making this conclusion, the order relies on *Nicholson* as articulating a different sort of criteria than the *Frazier*-factor analysis for recantation cases, stating "[witness recantations or affidavits] *will* warrant a new trial if it appears a jury would find the recanting affidavits and subsequent testimony more believable than the prior testimony."[49] But *Nicholson* makes no such holding.

---

[49] Emphasis added.

38

In *Nicholson*, the Court found that the recantation testimony was unreliable and *based on the entire record*, made the *factual* finding that that the outcome would have not been different because it was implausible that the jury would find the recantation evidence was as reliable as the trial testimony.[50]  It did not create a legal presumption in favor of a new trial if the recantation evidence was more believable.  So, while we agree that the circuit court should undertake an analysis of whether the recantation testimony is credible and whether it might be more believable than prior statements, that is but one consideration in the overall question of whether the outcome will be necessarily affected by the recantation evidence.[51]  In other "new evidence" cases, we have emphasized that the strength of the State's case is an important factor in evaluating whether a new trial, even admitting the new evidence, would produce a different result.[52]

In Mr. White's case, the other primary sources of evidence against him were the physical evidence of sexual abuse, the jail letters, and evidence of flight.  To the physical evidence, Dr. Wallace testified that D.H. showed signs of sexual abuse, and that the scarring indicated that it was not a years' old injury, (i.e., that it was unlikely to have been cause by the biological father).  Whatever weight that may have been assigned, the

---

[50] *Nicholson,* 170 W. Va. at 704, 296 S.E.2d at 345.

[51] *See McBride*, 224 W. Va. at 210-11, 681 S.E.2d at 95-96 (evaluating credibility of new evidence and strength of other evidence of guilt in determining whether admission of confession would change trial outcome).

[52] *Id.*

jury heard that evidence directly comparing the timelines between abuse by the biological father and Mr. White that would be at issue in any second trial.

To the jail letters, we find it excessive here to reprint the testimony regarding the admissions Mr. White made there. Suffice it to say that Mr. White's prior habeas petition alleged that the testimony surrounding those letters "amounted to a confession by the Defendant himself [and] was at least as devastating and central to the prosecution's case as the Hasty testimony[.]"[53] Given that Mr. White himself acknowledges that the testimony surrounding those letters contributed to his conviction as much as the testimony of Ms. Hasty in relaying the children's statements to her, it must be considered in an overall analysis of whether this additional inconsistent statement would be likely to cause a different result. Additionally, the jury heard evidence that after Mr. White learned he was being investigated for sexually abusing the children, he fled the state. While not indicative of guilt per se, it was evidence that should also have been considered in analyzing the fourth *Frazier* factor.

**C.** **Compliance with West Virginia Code § 53-4A-7(c)**

---

[53] Despite this contention in prior proceedings, Mr. White argued to the circuit court below that the other evidence against him was "flimsy" and "easily refuted." To this point, we reiterate that while Mr. White may characterize it that way, the jury convicted him on that evidence. Its admission was not disturbed on appeal, and Mr. White did not raise sufficiency of the evidence grounds as to D.H. or to S.H.-1. While he did raise sufficiency of the evidence challenges to S.H.-2 and M.H., those were rejected.

We find that the circuit court's analysis was so limited because it was colored, almost in its entirety, by the emphasis it placed on the fact that these victims did not testify as children and were telling a different story as adults. Pertinent as that may be, the capacity of the recanting child victims and trustworthiness of the recantation evidence needed to be established. Further, more than conclusory restatements of the *Frazier* factors was necessary before deeming them satisfied. We have held that "West Virginia Code section 53-4A-7(c) (1994) requires a circuit court denying or granting relief in a habeas corpus proceeding to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner, and to state the grounds upon which the matter was determined."[54] That requirement serves to satisfy due process for a habeas applicant, but also enables appellate review.[55] We have discussed that in the absence of requisite findings of fact and conclusions of law, speculation is the only option at our disposal, and "'[t]he mission of the appellate judiciary is neither to mull theoretical abstractions nor to practice

---

[54] Syl. Pt. 1, *State ex rel. Watson v. Hill*, 200 W. Va. 201, 488 S.E.2d 476 (1997). West Virginia Code § 53-4A-7(c) provides in relevant part that

> [w]hen the court determines to deny or grant relief, as the case may be, the court shall enter an appropriate order with respect to the conviction or sentence in the former criminal proceedings and such supplementary matters as are deemed necessary and proper to the findings in the case[.] . . . In any order entered in accordance with the provisions of this section, the court shall make specific findings of fact and conclusions of law relating to each contention or contentions and grounds (in fact or law) advanced, [and] shall clearly state the grounds upon which the matter was determined[.]

[55] *Watts v. Ballard*, 238 W. Va. 730, 732-34, 798 S.E.2d 856, 858-60 (2017).

41

clairvoyance.'"[56] For that reason, we have recognized that, "in most circumstances the failure to make specific findings of fact and conclusions of law regarding an issue raised in habeas proceedings . . . necessitate[s] a remand."[57]

Consistent with that precedent, the *Frazier* factors required individual and thorough analysis, especially where, as here, it is more involved and multi-layered due to its distinctive facts. Because the circuit court is in the best position to conduct that analysis, we vacate the order and remand for further proceedings.

## IV.  CONCLUSION

For the reasons stated above, we vacate the October 12, 2022 order of the Circuit Court of Mercer County and remand for further proceedings consistent with this opinion.

Vacated and remanded.

---

[56] *Dennis v. State, Div. of Corrections*, 223 W. Va. 590, 593, 678 S.E.2d 470, 473 (2009) (quoting *State v. Miller*, 194 W. Va. 3, 14, 459 S.E.2d 114, 125 (1995)).

[57] *State v. Warden, W. Va. Penitentiary*, 207 W. Va. 11, 19, 528 S.E.2d 207, 215 (1999).